[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
August 29, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-13799

_____

D.C. Docket No. 00-08179-CV-1-DLG

CLEO DOUGLAS LECROY,

Petitioner-Appellant,

versus

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,

Respondent-Appellee.

_____

Appeal from the United States District Court for the
Southern District of Florida

_____

(August 29, 2005)

Before ANDERSON, BIRCH and HULL, Circuit Judges.

HULL, Circuit Judge:

In 1986, the defendant, Cleo Douglas LeCroy, was convicted of two counts

of first degree murder and two counts of robbery with a firearm and sentenced to

death for one of the murders.[1]  After exhausting his state-court remedies, the defendant filed a § 2254 petition challenging his convictions and death sentence. The district court denied the defendant's § 2254 petition, but granted a certificate of appealability on several issues.  After oral argument in this appeal, the Florida Supreme Court vacated the defendant's death sentence based on Roper v. Simmons, 125 S. Ct. 1183 (2005), because he was 17-years-old at the time of his offenses.[2]  See Roper 125 S. Ct. at 1200 (concluding that "[t]he Eighth and Fourteenth Amendments forbid imposition of the death penalty on offenders who were under the age of 18 when their crimes were committed").  Accordingly, we need only address the defendant's guilt-phase issues.  After review, we dismiss as moot the defendant's § 2254 petition to the extent it challenges his now vacated death sentence, but affirm the defendant's convictions.

## I. Background

Because the state courts denied certain guilt-phase claims based on the overwhelming evidence against the defendant, we first review the trial evidence in great detail regarding the murders of John and Gail Hardeman.  That evidence

---

[1]For the sake of simplicity, we refer to Cleo LeCroy as "the defendant" and his brother, Jon LeCroy, by his full name.

[2]The State of Florida joined the defendant's motion, filed in state court, to vacate his sentence based on Roper.

includes the defendant's confessions to the police and his ex-girlfriend, as well as physical and circumstantial evidence corroborating the defendant's confessions.

## A.     The Crime

On January 3, 1981, while in the Miami area, the defendant informed his ex-girlfriend, Carol Hundley, that he had been in the Brown's Farm Area and had used a man's .30-06 rifle without the man's knowledge.  The Brown's Farm Area is a hunting area that is 21 square miles of densely wooded, rugged terrain in Palm Beach County, Florida.  The defendant told Hundley that he and his family were going back up to the Brown's Farm Area and made arrangements to meet her there the next day.

The next day, on January 4, 1981, the defendant encountered William Steve Martin in the Brown's Farm Area and asked if he had seen the Hardemans.  Martin informed the defendant where he had last seen the Hardemans.  At the time, the defendant was carrying a shotgun and a .22 caliber pistol in a side holster.  Approximately ten minutes later, Martin saw the defendant exchanging pleasantries with the Hardemans.  Approximately 45 minutes after that, Martin heard a shotgun blast, followed by a series of small-caliber shots.  Although it was not unusual to hear such gunfire during hunting season, the defendant had just

killed John and Gail Hardeman. The defendant had also stolen the Hardemans' .30-06 rifle and .38 handgun.

When the defendant went back to his family's campsite, he immediately spoke with Hundley, who had driven up to the area to meet him. The defendant informed Hundley that a man had shot at him and that he shot the man in the head with his shotgun. The defendant told Hundley that the man had shot at him because he was using the man's rifle. The defendant also told Hundley that he had taken the man's wallet and showed her the $30 he had taken. After telling Hundley that he had thrown away his jacket that had a bullet hole in it from where the man had allegedly shot at him, the defendant burned his pants.[3]

The defendant and Carol Hundley then drove to where he had hidden the Hardemans' .30-06 rifle and .38 handgun and put them in the back of the truck. On the way back to Miami, Florida, the defendant also told Hundley that a woman had come running out of the bushes and that he had shot her three times with his .22 pistol, once in the head, neck, and chest. At that time, the defendant said something about there not being any witnesses.

---

[3]The defendant also informed his brother, Jon LeCroy, that he had shot a man and where he had shot the man. Jon LeCroy became very upset and stormed off.

After returning to Miami, the defendant gave the .38 handgun to Jon LeCroy. The defendant planned on selling John Hardeman's .30-06 rifle.

On January 5, 1981, John Hardeman did not show up for work. This caused his parents to become concerned, and they contacted the authorities. Also on January 5, the defendant sold John Hardeman's .30-06 rifle to William Ellett for $100.[4]

On approximately January 6, 1981, the defendant told Carol Hundley that he was going to shoot sand through the barrel of his .22 pistol to damage the barrel and prevent a ballistics match. The defendant also told Hundley that he wanted to go back to the area to cut the bullets out the bodies so they could not be traced.

**B.    The Search**

On January 7, 1981, the authorities initiated an intensive search for the Hardemans. Although the authorities were able to locate the Hardemans' campsite and vehicle, they were unable to find any sign of the Hardemans. Therefore, the authorities placed alerts in the local media seeking any information regarding the Hardemans.

---

[4]About three or four weeks prior to early January 1981, the defendant had spoken to William Ellett about Ellett's purchasing a rifle from him.

On January 9, 1981, Joyce LeCroy, the mother of the defendant and Jon LeCroy, informed a radio station that her family had seen the Hardemans while hunting. The LeCroys, including the defendant and Jon, volunteered to help with the search and arrived in the hunting area on January 9, 1981.

On the drive to the Brown's Farm Area, the defendant and Jon LeCroy rode with Hundley and Richard Freshour (a friend of the LeCroys). During the drive, the defendant and Jon LeCroy carried knives, and the defendant stated that he hoped his brother, Jon LeCroy, could cut the bullets out before the authorities found the bodies. Freshour also heard the defendant state that he shot the man because the man shot at him first.

Jon LeCroy informed the authorities that he had last seen the Hardemans at 8:00 a.m. on January 4, 1981, in the Brown's Farm Area. The defendant informed the authorities that he had last seen the Hardemens at 11:00 a.m. on January 4, 1981, in the Brown's Farm Area.[5]

Still on January 9, 1981, the defendant assisted the authorities in searching an area that had been previously searched several times. During the search, the defendant discovered a backpack and boat-cushions belonging to the Hardemans.

_____

[5]During the defendant's state court trial, several witnesses were prepared to testify that Jon LeCroy had stated that he had seen the Hardemans alive after 11:00 a.m. The state trial court excluded such testimony on hearsay grounds.

According to the authorities, the defendant could not have found the backpack and boat-cushions without prior knowledge of their whereabouts because they were covered with bushes behind a hilly area.

The LeCroys went home on January 9, 1981. When the authorities called Tom LeCroy (the defendant's and Jon LeCroy's father) to see if they would be returning the next day to assist with the search, Tom LeCroy stated that he would have to call back. A short while later, Tom LeCroy called the authorities and stated that he and his sons would return to the area to search for the Hardemans, but that he wanted to continue the search without any police officers coming with the family.

On January 10, 1981, the LeCroys again assisted the authorities in the search for the Hardemans. Both the defendant and Jon LeCroy professed to be great trackers who could find the Hardemans if they were given enough time.

The defendant began searching for the Hardemans with State Wild Life Officer Steve Chance. During the search, the defendant professed to see tracks of the Hardemans but Officer Chance did not see anything. The defendant further claimed that Gail Hardeman was in "thick brush" and that officers would not find the Hardeman woman with the man. The defendant claimed to get all this information from "signs" he was reading in the woods. While supposedly tracking

7

the Hardemans, the defendant informed Officer Chance that the Hardemans would not be found alive and that the woman would be away from the man.

While the defendant began his search with Officer Chance, he spent most of January 10, 1981, searching for the Hardemans with Elsie Bevan, a 60-year-old volunteer reserve Wild Life Officer with the Florida Game and Fresh Water Fish Commission.

The defendant came up to Bevan on January 10, 1981, and told her that he could "track" her to the "bodies." Bevan said this was strange because, at the time, people were not assuming that the Hardemans were dead. The defendant stated that he would help Bevan if she went into the woods alone with him. After obtaining permission from her supervisors, Bevan accompanied the defendant into the woods.

The two started their search where the defendant had found the backpack and cushions the day before. When they got to the area, there were other officers present. The defendant then asked Bevan if she would take a 10-minute walk with him. Again, she agreed. During all this time, the defendant claimed to be a great tracker.

During his search with Bevan, the defendant stated that he saw signs that two Cubans and a "nigger" had dragged Gail Hardeman. The defendant also said

8

that he saw signs that John Hardeman was dead and that Gail Hardeman was running and screaming.

When Bevan told the defendant that she was a mother and worried about the Hardemans, the defendant asked her "why worry?" they are dead. Shortly thereafter, Bevan asked why they were searching so rugged an area. The defendant informed her: "If you put a gun to her head, she'd have to go anywhere." Bevan then asked the defendant how someone could force two people, who were armed, to go anywhere. The defendant responded: "If you put a gun to her head, John would have to put his down." The defendant also told Bevan that John Hardeman had a gun and that Gail Hardeman had a .38 handgun in her pocket.

Although Bevan never saw any signs of the Hardemans, the defendant professed to see signs of where Gail Hardeman was raped and knocked out. The defendant also claimed to see signs that after Gail Hardeman had been knocked down, she got up running and screaming, and trying to get back to see if her husband was dead. When Bevan asked if he had heard Gail screaming, the defendant replied "no, I was a mile from there."

The defendant also told Bevan that he was smarter than the police officers. The defendant further stated that the police thought that he was dumb, "but they

9

are dumb because they are looking for blood. . . . They won't find any blood." When Bevan asked why, the defendant responded that "if you strangle somebody there is no blood." The defendant also claimed that he saw signs that the bodies had been covered.

When Bevan asked him to take her to the bodies, the defendant said several times that he could not take her to the bodies yet because "they would think that I did it." The defendant said that his brother would take them to the bodies the next day.

When Bevan asked him why someone would bring the Hardemans way out here to kill them, the defendant said, "Well, because, you know, if they get the bodies, the police can identify what they were shot with, what kind of gun."

No discoveries were made on January 10, 1981.

After the authorities called off the search for the night, Mr. and Mrs. LeCroy (the defendant's and Jon LeCroy's parents) informed the authorities that they would not be coming back to the area to search for the Hardemans. However, the authorities offered to pick-up the defendant and Jon LeCroy so that they could assist in the search.

On January 11, 1981, the authorities picked up the defendant and Jon LeCroy so that they could assist in the search for the Hardemans. Once the

defendant and Jon LeCroy arrived at the Brown's Farm Area, the defendant asked Jon LeCroy "what are we going to do?" Jon LeCroy then drew a circle on the ground. Jon LeCroy that said, "Here is where we are now," and drew a line through the circle. Jon LeCroy continued: "We are going back there and when we pass this tree with this construction tape on it, I want you (the defendant) to get off because I am going to take Elsie [Bevan] straight back into the Brown's Farm because I have a gut feeling I am going to take her right to the bodies."

When the defendant and Jon LeCroy separated, the defendant began searching with Officer Chance. The defendant informed Officer Chance that they should be searching for something white because Gail Hardeman was wearing thermal underwear and that they should also be searching for a diamond ring because Gail was wearing a diamond ring.

About 20 minutes after the defendant and Jon LeCroy separated, Jon LeCroy found John Hardeman's body. When the call came in that John Hardeman had been found, the defendant kept saying that "I know she [Gail Hardeman] is around here. She has got to be alive." However, a short while later, the authorities found Gail Hardeman's body.

John Hardeman died from a single shotgun slug to the head. His wallet and a .30-06 hunting rifle were missing. Gail Hardeman's body was found

11

approximately 400 feet away. A .38 revolver belonging to her was missing, her trousers were unzipped, and her brassiere was partially undone. However, there were no signs of a struggle, the body had not been moved, and all of Mrs. Hardeman's jewelry was present. She died from three .22 caliber, close-range gunshots to the chest, head, and neck.

After the discovery of the bodies, the authorities questioned the defendant and Jon LeCroy. The LeCroy family volunteered to travel to the police station for further questioning. After the LeCroys arrived at the police station, the defendant received and waived his rights and gave two inculpatory statements to the police.

## C. The Defendant's Confessions

After the state trial court originally suppressed the defendant's confessions and other evidence, the state appealed. The Florida Supreme Court reversed and ordered that the defendant's following confessions and other evidence were admissible. See State v. LeCroy, 461 So.2d 88, 90-93 (Fla. 1984).[6]

On January 11, 1981, after being advised of his Miranda rights, the defendant gave the following taped confession at the police station to detectives Welty and Copeland.

---

[6]The United States Supreme Court denied the defendant's petition for certiorari. LeCroy v. Florida, 473 U.S. 907, 105 S. Ct. 3532 (1985).

Defendant: I was pretty-well lost.  I saw a pig and I shot him with a slug and it went ricocheting around.

Welty: You shot a pig?

Defendant: At a pig.

Welty: Okay

Defendant: Hit a tree, broke the tree in half and went into a head.[7]  I heard it bouncing around.

Welty: Let me kind of – I am going to keep interrupting you. Okay?

Defendant: Okay.

Welty: You shot a pig with a slug.  What kind of gun were you carrying?

Defendant: .12-gauge, single shot.

Welty: What brand? Do you know was it Smith and Wesson, Ithaca?

Defendant: I don't know.

Welty: You don't know the name?  You are an (inaudible) hunter.

Defendant: It ain't my gun.  It was a Smith and Wesson.

Welty: Whose is it?

Defendant: My brother's.

---

[7]A head is a hunting area in the Brown's Farm Area.

Welty:      Were you carrying any other weapons?

Defendant:  Yes, I carried a 8mm and a .22.

Welty:      You were carrying three guns?

Defendant:  No, no, no.

Welty:      I just want to know the guns you were carrying.

Defendant:  8mm.

Welty:      When, Sunday?

Defendant:  Yes, shotgun and a .22.

Welty:      What kind of .22.

Defendant:  I have no idea.

Welty:      Pistol?

Defendant:  Yes, pistol.

Welty:      Whose pistol?

Defendant:  Mine.

Welty:      Where is it at now?

Defendant:  Home.

Welty:      It is at home?  Okay.  You was hunting.  You shot at a pig.  Apparently you missed and the bullet was ricocheting around?

Defendant:   In the – inside of a head it went –

Welty:        How long have you been hunting?

Defendant:   Roughly 10 years.

Welty:        A slug doesn't ricochet around a head of trees.

Defendant:   Well, it was [sic] sounded like the bullet, the slug.

Welty:        Okay.  What happened then?

Defendant:   When I walked into the head and I saw a man there that I (inaudible) described as John.

Welty:        Do you think it was John?

Defendant:   Well, I saw his jacket there afterwards.

Welty:        Same jacket John had on?

Defendant:   Same jacket.

Welty:        How was the man lying?

Defendant:   On his back.

Welty:        Face up? You could have saw his face?

Defendant:   I couldn't get close enough.  It was down like this.

Welty:        Like on his face covering it?

Defendant:   That or it could have fell.

Welty:        Did you check to see if he was bleeding?

Defendant: No.

Welty: Sleeping?

Defendant: No, I didn't.

Welty: Did you see any blood?

Defendant: No.

Welty: How close did you get to him?

Defendant: Roughly anywhere between 10 and 20 yards.

Welty: Okay.

Defendant: Could have been even five.

Welty: Did you panic?

Defendant: Yes, I did, very much.

Welty: What went through your mind?

Defendant: Well, well at that time nothing, really because it was – I just completely blacked out.

Welty: Okay. What happened then?

Defendant: You know (inaudible) I turned around and shot three times with a .22 and that is when I saw his jacket and it was outside the head, got my head together and started in.

Welty: When you heard twigs break, you shot at a jacket?

16

Defendant: About that time I well (inaudible). I saw something brown and I shot but I had my eyes on –

Welty: How may time did you shoot?

Defendant: Three times.

Welty: How may times did you hit the jacket?

Defendant: I have no idea.

Welty: Did the jacket, was there – apparently there was someone in the jacket. I mean, jackets don't just walk around, right?

Defendant: It could have been anybody because that is the jacket he had on that morning.

Welty: Hey, wait a minute. If you hear twigs break, you turn around and you hear – and you see a jacket and you fire quick, was it Gail?

Defendant: I can't tell you.

Welty: Was it Gail?

Defendant: I can't really tell you that. It had to have been his jacket on. It had to have been.

Welty: Well, you just saw Gail not more than 20, 30 minutes and you knew what kind of jacket she had on. Was it Gail?

Defendant: She had a green one on and he had a brown one and that is the one I shot I shot towards, the brown jacket.

17

Welty:      And what color jacket did John have on when he was laying on the ground dead?

Defendant:  He didn't have one on.  He had a checkered shirt on.

Welty:      No jacket?

Defendant:  No, he took the jacket off like maybe she got cold and he gave it to her to put –

Welty:      You saw her face?

Defendant:  No. I saw the brown jacket.

Welty:      Come on, level with me.

Defendant:  All I am telling you my eyes (inaudible) shot [sic] and they closed.

Welty:      Did you know it was Gail?

Defendant:  I am almost positive it was.

Welty:      Not almost positive.

Defendant:  Yes.

Welty:      When –

Defendant:  Yes, it was.

Welty:      You are positive.

Defendant:  Yes.

Welty:      Okay.  Did she fall down?  Did she scream?

18

Defendant:  No.

Welty:      Did you see blood?

Defendant:  No, no words were said, no words at all, no yell, no nothing.

Welty:      What did you shoot for, make sure there is no witnesses?

Defendant:  Yes, sir.

Welty:      Okay.

Defendant:  Because I was running scared.

. . .

After repeatedly denying that he had approached the bodies, taken the Hardemans' guns, or hidden the backpack and cushions, the defendant altered his story during his first taped confession.

Defendant:  I just remembered everything.  She drawed on me and shot at me and that is what made me shoot that way. That is what made me shoot that way.

Welty:      This is not a make-up story.

Defendant:  I swear on my life it is.  It ain't no make-up story.  That is what happened.

Welty:      You shot John.  You knew it was John from the clothing and hat and over his head about 20 yards from him you heard –

Defendant:  Well, I heard –

19

Welty: Wait a minute. You heard the bushes crack. Now, what happened. Now you can talk.

Defendant: I turned around and I remember just like her having a gun in her hand. I ain't too sure if she shot because I wasn't really looking that close. I heard a shot, that had to come from her. That is when I shot.

Welty: No, no, Dougie. Come on, get – if someone shoots at me, I am going to know it, hey, they shooting at me, you know. Did she shoot at you? I don't want no maybes.

Defendant: Yes, because it went right next to my neck.

Welty: Which side of your neck?

Defendant: My left side of my neck.

Welty: How may times did she fire?

Defendant: One time. That was why I pulled out my pistol.

Welty: How may time did you shoot?

Defendant: Three times.

Welty: Did she holler at you?

Defendant: She didn't say a word, no. None of us said one word. Maybe she was shocked at what she saw, the accident. It was an accident and that is – she just didn't talk. That is the way I was, too.

Welty: When she fell on the ground, you saw her fall, right?

Defendant: Right.

20

. . .

Defendant:   . . .   I saw blood squirt, go out of her when I hit her more or less in the neck.

Welty:        Oh, in the neck?  Okay.

. . .

Welty:        Okay.  And are you sure that your guns are at your house?

Defendant:   My own.

Welty:        Yes.

Defendant:   Or theirs?

Welty:        Yours?

Defendant:   At my house, out, up, cleaned, just like I always do.

Welty:        All right.  You didn't damage your .22 or anything like that?  You know some people, if they want to hide a murder, they will knock the barrel out to kind of change the groves in it but you didn't do anything like that?

Defendant:   I didn't even think of doing nothing like that.

. . .

Investigators then returned to the defendant's statement that Gail Hardeman had shot at him.

Welty:        Did you see her with a gun in her hand?  Be honest.

21

Defendant: Not positively, no.

Welty: All right. Before you said her hands were in her pockets. Then you said she had a gun in her hand, you knew she had a gun. That was discussed because she is supposed to have been a pretty good shot with her hands in her pocket, son. Be honest with me, please.

Defendant: Well, I am positive that there was a bullet fired from that direction.

Welty: Her hands were in her pockets.

Defendant: She could have just had it right there by her pocket, shot through the pocket or anything because there was a bullet fired from that direction.

Welty: It could have been another hunter?

Defendant: It could have been anyone.

Welty: But her hands were in her pockets. If she fired – I'm going to stand up and show you, put my hands in my pockets. I have no guns or anything on, no guns in my pocket, I promise you. Do you think she could have fired from her pocket, you are saying but her hands were in her pockets?

Defendant: In her jacket pockets.

Welty: In her jacket pockets? Her hands were in her jacket pockets?

Defendant: Well, in here, yes, from this pocket. That is where the jacket –

Welty: I am going to give you a minute to think. You think back and let it go through your mind.

. . .

Defendant: Yes, her hands were in her pockets.

Welty: Without a shadow of a doubt?

Defendant: Without a shadow of a doubt.

Welty: You killed her so she wouldn't be a witness?

Defendant: Unless she fired from her pockets. I know there was a shot fired from that direction, only one.

Welty: What did you shoot her for, so she couldn't tell –

Defendant: What?

Welty: You killed that woman so she couldn't –

Defendant: Well, for that reason and plus I thought she was the one that shot at me.

Welty: No, I am not going to buy that.

Copeland: You just killed her because you didn't want her to talk?

Defendant: Okay, I did.

Welty: Is that the truth? You just shook your head in disgust or whatever.

Defendant: There was a shot fired. There was a shot fired from that way. There was a shot from that direction.

23

Welty:        A shot fired.  Did she fire that shot?  You don't know, right?

Defendant:  No, I don't know.

Welty:        Her hands were in her pockets?

Defendant:  As far as I know she could have shot through her pocket but otherwise she didn't do it.

Welty:        But you didn't – you didn't want her alive, did you?

Defendant:  No, at the time, no, I was scared.  I didn't know what to do.

Welty:        You didn't want no witnesses, nobody to put the finger on Dougie being the one that killed those two people or the first person and the second?

Defendant:  No, no.

After giving this first statement, the defendant almost immediately asked to speak to a second officer to correct his story.  The defendant again received and waived his Miranda rights.  Detective Richard Browning then recorded the defendant's second confession.

Browning:  If you would, at this time, I would like you to tell me what happened?

Defendant:  All right.  I was tracking a hog into the head.  I was following just the tracks.  I didn't see him.  I went in the head and the hog, where he was laid down got up and took off.  By the time I fired at him I hit John, some guy in the head named John.  I don't know the last name.  I

24

went over there and I looked at it and it scared me and I picked up the hat and laid it on top of him. It made me sick from what I saw. So, I picked up the gun and got ready to head out. I picked them back up and took them, took them with me.

Browning: You took what with you?

Defendant: The guns.

Browning: What type of guns?

Defendant: .30-06 rifle and a .38 special. I was going out of the head scared. I was almost out when his wife came up, approached me and asked me what I was doing with his gun. I made no comments and she started yelling. Her hands went straight up in the air. She started really yelling loud. My head was killing me and she really started yelling loud and that is when I turned and shot her.

Browning: What did you shoot her with?

Defendant: A .22 pistol.

Browning: Pistol? How many times did you shoot her?

Defendant: Three times.

. . .

Browning: What did you do with the two guns when you went to camp?

Defendant: I put them in the bushes at that time until the chance I got and I went and got them and put them in the truck.

25

. . .

Browning: Can you explain to me how Gail Hardeman's pants were found undone?

Defendant: Well, I felt for a heartbeat right from under the bellybutton. I felt in with my finger tips to see if I could feel the heartbeat and I couldn't feel nothing and I felt on the upper rib cage and I didn't feel no beat. Maybe because I was so nervous my hands were shaking.

Browning: Let me ask you this: Can you explain to me how, if she was so upset and she was waving her hands around, how is it that when the body was found and her hands were in her pockets?

Defendant: I stuck them in there.

Browning: Why did you do that?

Defendant: Well, I was scared.

Browning: Well, for what reason did you think to do that?

Defendant: Make it look like an accident.

. . .

Browning: Can you explain to me how it was the day you were helping us with the search that you got off the halftrack and went directly to John and Gail's knapsack and the cushions and the personal belongings that was hidden in the burn area where you first talked to them that day?

Defendant: That had to have been a coincidence because I just went right where they were.

26

Browning: You had no part in putting them there?

Defendant: No part in putting them there.

. . .

Browning: Okay. And you say that the shooting of the male was an accident but then the shooting of the female was an intentional thing?

Defendant: Yeah.

Browning: Okay.

Defendant: Because my head started really busting open and I lost control.

The defendant and Jon LeCroy then directed officers to William Ellett's home. At Ellett's residence, the authorities recovered John Hardeman's .30-06 rifle. While some officers went to the LeCroy's residence to recover the defendant's shotgun and .22 caliber pistol, other officers went to Rosie Harris's home to recover Gail Hardeman's .38 handgun.[8]

While officers were en route to the LeCroy residence, the defendant apologized to Deputy Welty for lying and stated that he got a nail and ran it through the barrel of his .22 pistol to prevent a ballistics match.[9]

_____

[8]Rosie Harris was a friend of Jon LeCroy's.

[9]In addition to his confessions to law enforcement and his ex-girlfriend, the defendant also confessed to Roger Clayton Slora, a Florida State prisoner who was incarcerated with the defendant. Slora testified that the defendant stated that when he shot John Hardeman, he was

27

## II. The Trial

The defendant and Jon LeCroy were indicted together, but tried separately, for the first-degree murders and armed robberies of John and Gail Hardeman.[10]  At the defendant's trial, the jury heard all the evidence outlined above during the government's case-in-chief, including the defendant's confessions to law enforcement, his ex-girlfriend, and Roger Slora.  Defense counsel cross-examined all but one of the government's witnesses.  After the state rested, defense counsel elected not to present evidence.  Rather, the defense elected to hold the government to its burden of proof.  Under Florida law, this allowed defense counsel to have the final closing argument.  See Fla. R. Crim. P. 3.250.

During its closing argument, defense counsel focused on the difference between felony murder and third-degree murder.  This was important because a conviction for felony murder would make the defendant eligible for the death

---

looking into John Hardeman's eyes and that he got a rush from shooting Hardeman in the head.  Slora also testified regarding sexual contact between the defendant and Gail Hardeman.  The state also used witness Slora in its prosecution of Jon LeCroy.  According to Slora, Jon LeCroy told the defendant that "I killed for you."  According to the government at Jon LeCroy's trial, this meant that Jon LeCroy killed John Hardeman.

[10]The defendant and Jon LeCroy were indicted on February 4, 1981, for two counts of first-degree murder and two counts of robbery with a firearm.  The defendant was tried in February 1986, and the jury returned a guilty verdict on all counts on February 28, 1986.  The defendant's penalty phase was conducted on March 10, 1986.
Jon LeCroy's trial began in April 1986, and Jon LeCroy was acquitted of all charges on April 18, 1986.  On October 1, 1986, the state trial judge sentenced the defendant to death for the murder of Gail Hardeman.

penalty, but a conviction for third-degree murder would not. Defense counsel noted that there were two means by which felony murder could be proven with respect to John Hardeman; namely, that the defendant killed John Hardeman with the intent to steal his .30-06 rifle or that the defendant killed John Hardeman with premeditation. The defense then argued that the evidence did not show either of these means beyond a reasonable doubt.

According to defense counsel, the evidence showed, at best, that the defendant had taken the .30-06 rifle and .38 pistol <u>after</u> he had killed the Hardemans, not because of any premeditated plan to sell the rifle, but as the result of a desperate 17-year-old who was not thinking straight. Therefore, counsel argued, the jury should find that the defendant committed a theft, rather than a robbery, and find him guilty of third-degree murder. The defense emphasized that nothing was taken from the Hardeman's campsite and that none of John and Gail Hardeman's jewelry was taken.

As for Gail Hardeman, defense counsel conceded that there was some evidence of premeditation; namely, the defendant's statements that he killed Gail Hardeman to get rid of any witnesses. However, defense counsel argued that the defendant said many different things and that it was more likely that Gail

29

Hardeman was killed out of fear and over-reaction rather than an plan to eliminate witnesses.

The defense went through all the evidence, emphasizing those pieces of evidence that could lead a jury to find a reasonable doubt on the felony-murder charge and attempting to explain away evidence that supported a felony-murder conviction.

After only 2½ hours of deliberations, the jury convicted the defendant of felony murder of John Hardeman, premeditated murder of Gail Hardeman, and two counts of armed robbery.

After the defendant was found guilty of murdering the Hardemans, he fired his court-appointed attorney, and retained private counsel for the penalty phase. Following the sentencing proceedings, the jury recommended life, by an 8-4 vote, for the murder of John Hardeman and death, by a 7-5 vote, for the murder of Gail Hardeman. The state court sentenced the defendant to death by execution for the murder of Gail Hardeman, life-imprisonment for the murder of John Hardeman, and thirty years' imprisonment for each of the robbery convictions.

### III. State Direct Appeal

In his state direct appeal, the defendant raised several issues regarding his death sentence, including a claim that the imposition of the death penalty on

someone who was less than 18-years-old at the time he committed the crime violates the United States Constitution. Because the Florida Supreme Court has vacated the defendant's death sentence, we do not outline the sentencing issues the defendant raised on direct appeal and at various stages of the proceedings. Instead, we focus on the conviction issues the defendant raised.

In his state direct appeal, the defendant asserted five issues relating to his convictions; namely, that: (1) the second confession given to the police, to correct inaccuracies in his first statement, was inadmissable; (2) the robbery charges were inadequate to properly advise the defendant of the charges against him; (3) Jon LeCroy's inculpatory statements regarding the last time he saw the Hardemans alive should have been admitted during the trial; (4) separate sentences for both robbery and felony murder based on robbery were inappropriate; and (5) the mandatory minimum sentences on the two separate robbery convictions were improper.

With regard to the defendant's second confession, the Florida Supreme Court declined to revisit its earlier, pre-trial ruling in 1985 that the statement was admissible. LeCroy v. State, 533 So.2d 750, 753 (Fla. 1988). The Florida Supreme Court also concluded that "having now received and reviewed the full record of the trial, it is clear beyond a reasonable doubt that admission of this

second statement, even if error, did not impact on the jury verdict." Id. (citing

State v. DiGuilio, 491 So.2d 1129 (Fla. 1986)).

The Florida Supreme Court also declined to revisit the state trial court's

conclusion that the robbery charges were "sufficient to apprise [the defendant] of

the nature of the crimes charged and did not mislead or embarrass [the defendant]

in the preparation of a defense." Id. at 754.

Next, the Florida Supreme Court addressed Jon LeCroy's allegedly

inculpatory statements as to when he last saw the Hardemans alive. According to

the Florida Supreme Court, the exclusion of this evidence was not error, and, even

if erroneous, any error was harmless. Id. Specifically, the Florida Supreme Court

stated that the defendant

> now argues that the trial court erred in refusing to admit hearsay
> evidence that Jon told others that he had seen dead bodies before and
> was the last to see the victims alive which, appellant urges, is a
> statement against interest within the meaning of [a Florida hearsay
> exception]. Concerning the statement that Jon saw the victims last, this
> is based on the testimony of a witness that Jon said he saw the victims
> at 11 a.m. the day of the murder and the testimony of another witness
> that Cleo told him he last saw the victims at approximately 10:30 a.m.
> Thus, appellant reasons, Jon made an admission against interest by
> saying he saw the victims after Cleo. We do not agree that a hearsay
> statement by Jon that he saw the victims at 11 a.m. is an admission
> against interest. Another witness testified he saw Cleo with the victims
> around 10 a.m. and Cleo admitted in his statement to the police that he
> had conversed with the victims that morning, for approximately twenty
> minutes, that they had separated, and that the killings occurred later after

32

a period of hunting. As to Jon saying that he had seen dead bodies before, the statement is meaningless without further development and could only have been developed by calling Jon as a witness. The state points out that had this been done, the state would have been able to elicit Jon's statement to the police that he had seen the victims bodies shortly after Cleo killed them. This would have been consistent with Cleo's statements to the police that he told Jon of the killings, and the approximate location of the bodies, shortly after the crimes. We see no error. Moreover, as the state argues, even if it was error, the error was clearly harmless. Evidence showing that Jon had also been indicted and had some role in either the crimes or in attempting to conceal the crimes was given to the jury. We do not see how this ambiguous hearsay could have affected the verdict.

Id. (internal citation and footnotes omitted).

As for the defendant's argument regarding his robbery convictions, the Florida Supreme Court noted that it had already concluded that "sentences on both felony murder and the underlying felony [robbery] were appropriate." Id. Furthermore, the Florida Supreme Court stated that the "uncontradicted evidence here was that [the defendant] first killed and robbed John Hardeman and, after an indeterminate lapse of time, killed and robbed Gail Hardeman when she arrived on the scene." Id. Consequently, the Florida Supreme Court rejected the defendant's assertion that he was improperly sentenced for two separate robbery convictions. Id.

Finally, the Florida Supreme Court affirmed the imposition of the death penalty for the murder of Gail Hardeman. Id. at 757-58. The United States

33

Supreme Court denied the defendant's petition for certiorari. LeCroy v. Florida, 492 U.S. 925, 109 S. Ct. 3262 (1989).

## IV. State Post-Conviction

**A.      Defendant's 3.850 Motion**

In 1990, the defendant filed a motion for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850.[11]  In 1996, the defendant filed a second amended 3.850 motion for post-conviction relief.  In his 171-page motion, the defendant raised the following claims regarding his convictions: (1) the lack of funding prohibited defense counsel from fully investigating and preparing his post-conviction motion, in violation of the Constitution; (2) the state withheld certain "files and records" pertaining to the defendant's case, namely taped statements by numerous witnesses; (3) the state committed Brady and Giglio violations; (4) ineffective assistance of appellate counsel, both in the appeal from the motion to suppress as well as in his state direct appeal, namely that the record on appeal was incomplete in both instances; (5) the trial court's statement that he would have to "lock up" the jurors if they did not reach a verdict by the end of the

---

[11]On April 29, 1992, the state filed a motion for the disclosure of defense counsel's files. In 1994, the Florida Supreme Court concluded that the defendant waived his attorney-client privilege when he filed a motion for post-conviction relief claiming ineffective assistance of counsel. LeCroy v. State, 641 So.2d 853, 854 (Fla. 1994).

day violated the defendant's constitutional rights (hereinafter referred to as the "lock-up statement");[12] (6) ineffective assistance of trial counsel for: (a) failing to pursue a defense centered around Jon LeCroy as the murderer; (b) failing to pursue a defense centered around self-defense; (c) failing to litigate the issue concerning the districting procedure in Palm Beach County; (d) improperly waiving jury instructions regarding affirmative defenses; and (e) not pursuing Brady and Giglio violations and failing to obtain various documents that could have been used at trial;[13] (7) the trial court's exclusion of Jon LeCroy's allegedly inculpatory statements violated the Constitution; (8) the state engaged in various instances of prosecutorial misconduct;[14] (9) the state's introduction of shocking

---

[12]The defendant takes the state trial court's lock-up statement out of context. The state trial court actually stated that: "I am required to lock you up in a hotel, not lock you up but keep you sequestered in a hotel where you can't separate . . . ." The state court was merely informing the jury of the how events were going to transpire during deliberations, and this statement did not constitute error.

[13]See Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194, 1196-97 (1963) (stating the government is obligated to produce evidence that is materially favorable to the defendant, either as substantive or impeachment evidence); Giglio v. United States, 405 U.S. 150, 92 S. Ct. 763, 766 (1972) (concluding that the "deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with due process").

[14]The defendant's prosecutorial misconduct claim consisted of the following allegations: (1) the state separately prosecuted both the defendant and Jon LeCroy for the murders of John and Gail Hardeman under the theory that each was the triggerman at their respective trials; (2) the prosecution engaged in witness tampering; (3) the prosecution referred to evidence not in the record during closing argument and was so animated that he was twice admonished by the trial court; (4) the prosecution attempted to elicit testimony, such as that Gail Hardeman was dragged, tied-up, strangled, and sexually molested, when there was no basis for such testimony; (5) the prosecution provided its witnesses with scripts of expected testimony; (6) the prosecution

35

and gruesome photographs violated the Constitution and trial counsel was ineffective for failing to object to them; (10) the defendant's constitutional rights were violated by Florida's Rules of Professional Conduct that prevent lawyers, or their associates, from speaking with jurors after a trial; (11) the trial court erroneously instructed the jury regarding expert testimony; and (12) the cumulative procedural and substantive errors during the defendant's trial violated the Constitution.

## B.   The State 3.850 Court's Decision

The defendant's 3.850 motion was originally scheduled for an evidentiary hearing.[15] However, after the case was transferred, the new judge summarily determined that an evidentiary hearing was unnecessary.

Although the State 3.850 Court did not hold an evidentiary hearing on the defendant's amended 3.850 motion, it did issue a 20-page opinion addressing each of the defendant's claims. With respect to the defendant's claim that a lack of funding prohibited his attorney from fully investigating and preparing his post-

---

misstated the role of mitigating evidence; and (7) the prosecution engaged in unprofessional conduct outside the courtroom to the point that he refused to further cooperate with the defense even in the "slightest" way.

[15]The State 3.850 Court did conduct a hearing pursuant to Huff v. State, 622 So.2d 982 (Fla. 1993). A Huff hearing is used to determined whether an evidentiary hearing is necessary as to any claims.

36

conviction 3.850 motion, the State 3.850 Court concluded that the claim was

"legally insufficient as a matter of law." The State 3.850 Court also concluded

that the defendant "waived" his claim that the state withheld certain "files and

records" pertaining to his case, namely taped statements by numerous witnesses.

However, the State 3.850 Court gave no basis for concluding that the defendant

had waived the claim.

With respect to the defendant's claim that the state committed <u>Brady</u> and

<u>Giglio</u> violations, the State 3.850 Court concluded that the evidence was

overwhelming and that the defendant had not established a reasonable probability

that the outcome would have been different if the state had disclosed the evidence

in issue. Specifically, the State 3.850 Court concluded that

> [t]he evidence in this case was overwhelming. The Defendant not only confessed to killing the Hardemans to the police, but he confessed to Carol Hundley and Roger Slora. A plethora of physical and circumstantial evidence corroborated those confessions and further established the Defendant's guilt. Based on the wealth of evidence against him, there is no reasonable probability that his conviction or sentence of death would have been different had the State disclosed or defense counsel discovered the evidence alleged by the Defendant in this claim. Therefore, this claim is denied.

The State 3.850 Court also concluded that several claims were procedurally

barred because they "either were or could have been raised on direct appeal,"

including the defendant's claims that (1) the record on appeal was incomplete,[16] and (2) the trial court's lock-up statement violated the Constitution.

With respect to the defendant's claims that trial counsel was ineffective in numerous respects during the guilt phase of the trial, the State 3.850 Court concluded that the defendant had not shown a reasonable probability that counsel's performance would have affected the outcome of the trial. Specifically, the State 3.850 Court stated that

> singularly or cumulatively, the allegations of deficient conduct that are sufficiently pled, even if taken as true, would not have, within a reasonable probability, affected the outcome of this case. As noted previously, the quality and quantity of evidence presented by the State simply would not have been undermined even if defense counsel had presented the evidence that Defendant claims he should have presented. Therefore, this claim is denied.

With regard to the defendant's claim that the trial court's evidentiary ruling (excluding Jon LeCroy's inculpatory statements as to when he last saw the Hardemans) violated the Constitution, the State 3.850 Court determined that the claim was "procedurally barred as it was raised and rejected on direct appeal."

As for the defendant's claims of prosecutorial misconduct, the State 3.850 Court addressed each claim individually. With regard to the state pursuing a

---

[16]The State 3.850 Court also concluded that "Defendant has failed to show any errors that occurred during those proceedings that were omitted from the records on appeal."

38

theory at the defendant's trial that the defendant was the triggerman and a theory

at Jon LeCroy's subsequent trial that Jon LeCroy was the triggerman, the State

3.850 Court noted

> that trial counsel challenged the State's inconsistent theories in his motion for new trial. At the hearing on the motion, this Court found that the State had initially overstated Jon's involvement in Jon's trial and had then retreated to an aider and abettor theory. This Court also found the evidence of the Defendant's guilt overwhelming and denied the motion. The Defendant could have, but did not, challenge this Court's denial of his motion for new trial, and the State's inconsistent theories, on direct appeal. Thus, this claim is procedurally barred. It is also without merit.

The State 3.850 Court also concluded that the majority of the defendant's

claims regarding the state having presented misleading evidence and improper

argument, in violation of Giglio, were procedurally barred because they could

have been raised on direct appeal. However, the State 3.850 Court did address

two of the defendant's Giglio claims on the merits.

With regard to the state's efforts at having Roger Slora, the prisoner who

testified at both the defendant's and Jon LeCroy's trials, transferred to other

facilities in exchange for favorable testimony, the State 3.850 Court determined

that the defendant made nothing other than conclusory allegations. With regard to

the state providing scripts to its witnesses, the State 3.850 Court concluded that

> [w]hile it would hardly be improper for the prosecutor to draft a list of questions he intends to ask a witness, and the responses he intends to

elicit for his own use at trial, it is improper to influence a witness to answer falsely. The Defendant has made no allegation, however, much less a showing, that any of the witnesses gave false testimony. Thus, he has failed to establish even a prima facie case under Giglio.

The State 3.850 Court also addressed the defendant's claims that the state improperly argued to the jury and judge regarding the role sympathy and mercy should play. The State 3.850 Court concluded that these claims were procedurally barred because they either were or could have been raised on direct appeal. The State 3.850 Court also concluded that the defendant "may not use a claim of ineffective assistance of counsel to circumvent [procedural] bar. Regardless, the Defendant has failed to show either deficient performance or prejudice . . . ."

With regard to the defendant's claim that he was convicted and sentenced because of a personal vendetta by the prosecutor against defense counsel, the State 3.850 Court concluded that the defendant "did not, and cannot, show within a reasonable probability that any dislike between the prosecutor and defense counsel, or the actions of the prosecutor as a result thereof, affected the outcome of his trial. Thus, this claim is denied."

The State 3.850 Court also concluded that the defendant's claim regarding introduction of shocking and gruesome photographs was procedurally barred because it could have been raised on direct appeal. As for the defendant's claim

40

that defense counsel was ineffective for failing to object to the photographs or pursue the issue during his direct appeal, the State 3.850 Court concluded that the defendant "failed to plead such an allegation with specificity" and that the defendant had "failed to show prejudice."

The State 3.850 Court also addressed the defendant's challenge to the Florida Rules of Professional Conduct. According to the defendant, the rules prevented defense counsel from questioning the jury after the verdict, and, therefore, violated his constitutional rights. The State 3.850 Court rejected the defendant's argument, concluding that

> [t]he Rules are promulgated by the Florida Supreme Court to regulate members of the Florida Bar. The Defendant is not a member of the bar. Therefore, the Defendant does not have standing to challenge the applicability of a rule that does not govern him directly. Moreover, the law allows juror interviews under certain circumstances. The Defendant's inability to meet the requirements of this rule does not render his attorney exempt from the rules of professional conduct, nor does it render his conviction and sentence constitutionally infirm.

Finally, the State 3.850 Court concluded that the following claims were "procedurally barred as they either were or could have been raised on direct appeal": (1) the trial court erroneously instructed the jury regarding expert testimony; and (2) the cumulative procedural and substantive errors during the defendant's trial violated the Constitution. The State 3.850 Court also concluded

41

that "[t]o the extent Defendant claims that trial counsel rendered ineffective assistance for failure to 'fully litigate' these issues at trial, he may not circumvent the bar with such a claim in order to seek a second appeal."

## C. Florida Supreme Court

The Florida Supreme Court affirmed the State 3.850 Court's denial of the defendant's 3.850 motion. In the appeal from the denial of his 3.850 motion, the defendant raised the following issues related to his convictions: (1) failure to attach portions of the record to the order denying relief; (2) failure to grant an evidentiary hearing concerning Brady and Giglio violations, misleading evidence, and ineffective assistance of trial counsel; (3) failure to hold an evidentiary hearing concerning trial counsel's alleged ineffectiveness in the guilt phase; (4) failure to allow defense counsel to poll the jury; (5) the record on appeal contained omissions and misnumbered pages; (6) the exclusion of testimony concerning Jon LeCroy's role in the crimes; (7) the state engaged in various instances of prosecutorial misconduct; (8) the state improperly admitted gruesome and shocking photographs; (9) the jury was given the wrong standard for judging expert testimony; and (10) procedural and substantive trial errors during the defendant's trial violated the Constitution. LeCroy v. Dugger, 727 So.2d 236, 237 n.3 (Fla. 1998).

42

The Florida Supreme Court concluded that the defendant was not entitled to an evidentiary hearing on any of his claims in the 3.850 proceedings and that the State 3.850 Court applied the correct standards with respect to the defendant's claims relating to Brady and Giglio. Id. at 238-40. The Florida Supreme Court also concluded that the State 3.850 Court applied the correct standards and did not err regarding the defendant's claims that trial counsel was ineffective for failing to obtain the Brady materials or to object to the prosecution's alleged use of misleading evidence. Id. at 239-40.

With respect to the defendant's claim that his trial counsel was ineffective during the guilt phase, the Florida Supreme Court again concluded that "[t]he trial court properly applied the law. We find no error." Id. at 241. The Florida Supreme Court further decided that the defendant's claim that defense counsel was unable to poll the jury was "without merit." Id. at 241 n.12. With regard to the remainder of the defendant's 3.850 issues, the Florida Supreme Court summarily determined that they were "procedurally barred." Id. at 241 n.11.

**D.     State Habeas Petition**

At the same time he appealed the denial of his 3.850 motion to the Florida Supreme Court, the defendant filed a state petition for a writ of habeas corpus with the Florida Supreme Court. In his state habeas petition, the defendant raised the

43

following issues regarding his convictions: (1) ineffective assistance of appellate counsel for failing to raise a challenge to (a) the districting plan for selecting jurors, (b) the trial court's lock-up statement, and (c) misleading jury instructions; and (2) the trial court improperly excluded testimony concerning Jon LeCroy's admissions as to the time he last saw the Hardemans. LeCroy, 727 S.2d at 238 n.4.

As for the defendant's state habeas petition, the Florida Supreme Court, in the same opinion affirming the denial of the defendant's 3.850 motion, concluded that the issue of the improper districting plan for jurors had not been raised at trial and that the ineffective-assistance-of-appellate-counsel issue was foreclosed by Nelms v. State, 596 So.2d 441 (Fla. 1992). LeCroy, 727 So.2d at 241.[17]  The Florida Supreme Court also determined that there was no merit to the defendant's claim that appellate counsel was ineffective for failing to challenge the state trial court's lock-up statement. Id. at 241-42. Finally, the Florida Supreme Court summarily concluded that the defendant's remaining issues were without merit. Id. at 242 n.13. Thus, for a second time, the Florida Supreme Court affirmed the defendant's convictions and sentences.

---

[17]In Nelms, the Florida Supreme Court concluded that defense counsel was not ineffective for failing to anticipate a subsequent change in the Florida law regarding a Palm Beach County administrative order affecting the selection of jurors. Nelms, 596 So.2d at 442.

## V. Section 2254 Petition

On March 1, 2000, the defendant timely filed a federal habeas petition pursuant to 28 U.S.C. § 2254. Again, given the defendant's death sentence is now vacated, we discuss only those issues that relate to his convictions.

In a May 6, 2002 order, the district court noted that the state courts had properly concluded that certain claims by the defendant were procedurally barred under Florida law, the state's procedural bar rested on independent and adequate state procedural grounds, and that the defendant had failed to show cause and prejudice for his procedural default. Thus, in that order, the district court dismissed the following guilt-phase claims as procedurally barred: (1) the trial court's lock-up statement violated the Constitution; (2) the districting procedure in Palm Beach County was unconstitutional; (3) the state's introduction of shocking and gruesome photographs violated the Constitution; and (4) the state engaged in several instances of prosecutorial misconduct.

As to the remaining four guilt-phase claims, the district court, in its May 6, 2002 order, determined that the defendant had timely requested, but had been denied, an evidentiary hearing on his 3.850 motion in state court. The district court further noted that the State 3.850 Court signed, without change, the state's proposed order denying the defendant an evidentiary hearing and denying his

3.850 motion. The district court further found that the defendant was diligent in his efforts to develop the factual basis for his claims and obtain an evidentiary hearing in state court. The district court ultimately concluded that three of the defendant's four guilt-phase claims warranted an evidentiary hearing.[18]

In May 2003, the district court held an evidentiary hearing on the following three guilt-phase claims: (1) ineffective assistance of appellate counsel on direct appeal; (2) ineffective assistance of trial counsel; and (3) the state's violations of the constitutional requirements in Brady and Giglio.[19]

As for the defendant's guilt-phase claims, the testimony of two individuals during the evidentiary hearing is particularly relevant.[20] First, Richard A. Barlow,

---

[18]The district court further determined that the fourth claim – that the state trial court improperly excluded hearsay evidence regarding Jon LeCroy's guilt – did not warrant an evidentiary hearing because there were no factual issues regarding that claim. This evidence was Jon LeCroy's allegedly inculpatory statements as to when he last saw the Hardemans alive. As noted earlier, the Florida Supreme Court concluded that the exclusion of this hearsay evidence was not error, and even if erroneous, any error was harmless. LeCroy, 533 So.2d at 754.

[19]Over twenty witnesses testified at the defendant's evidentiary hearing, including family members, friends, mental health professionals, the defendant's school teachers, and others. The majority of the witnesses and testimony concerned mitigation evidence in the penalty phase.

[20]At the evidentiary hearing, Jon LeCroy initially testified, but then asserted his Fifth Amendment rights. Specifically, during cross-examination, the government asked Jon LeCroy: "You didn't shoot John Hardeman?" Jon LeCroy responded that a man was pointing a gun at his little brother so he shot him. The government accused Jon LeCroy of perjury and a lawyer was appointed for Jon LeCroy. At this point, all questioning of Jon LeCroy ceased.

However, the government wished to question Jon LeCroy again. Therefore, Jon LeCroy was called again at the conclusion of the evidentiary hearing. At this time, Jon LeCroy asserted his Fifth Amendment rights to all questions related to the murder of John Hardeman. The district court struck Jon LeCroy's earlier statement from the record and did not consider it when denying

46

the Assistant State's Attorney who prosecuted the defendant, testified at the evidentiary hearing. When Barlow was asked about the "scripts" he prepared for the witnesses in the defendant's trial, he responded that when "preparing the witness to testify in jail, I actually write out every question I intend to ask a witness, as well as describe in there the notes, the page of the deposition, the police report or whatever it is that I got the answer they had previously given, and I do that for almost every single witness in a major case." Barlow further stated that he gave these typed "scripts" to the witnesses and then "go[es] over with them those questions to confirm their answers are, in fact, based on what they have said in depositions, police statement, accurate. . . . I confirm with them whether that is still accurate, if there is any change in that, and that's how I actually prepare for that witness to testify."

> According to Barlow, the prosecution's
>
> theory was that the Hardemans had been out camping and hunting in the Brown's farm hunt area along with the LeCroy family, not together but in separate – it was very popular hunting area in southern Palm Beach County.
> That during the course of the time period that the parties were there, Jon and Cleo LeCroy came across the Hardemans who had been actually camped out there in a tent and camping area.

---

the defendant's § 2254 petition. On appeal, the defendant has not challenged the district court's evidentiary ruling, and thus we do not consider this testimony.

That Jon and Cleo, basically, together made certain determinations that they would be an easy couple to rob, that, in fact, Cleo did, in fact, rob them. He shot Mr. Hardeman and shot multiple times Ms. Hardeman. That he stole a wallet with approximately $30 from Mr. Hardeman and I believe it was, I believe it was a brand new thirty ought six rifle . . . .

. . .

Much of the State's position in this case was derived from the statements of Cleo LeCroy in his own statements to the police and his actions to the police in pretending that he was a great tracker that could go through the woods and see these foot prints where none were existing and he could come up with these stories to the police. The police were totally disbelieving of that and believed that he had a great deal of knowledge about what happened prior to their actually being found.

I believe my theory to the jury was that it was a combination of felony murder and first degree murder. In Florida we can present both simultaneously and allow the jury to make the selection. . . .

Thus, the prosecution's theory was that the defendant and Jon LeCroy planned to rob the Hardemans, that the defendant shot the Hardemans, and that it was a combination of felony murder and first-degree murder.

Second, James Eisenberg, a former Assistant State Public Defender who was appointed to represent the defendant during the state trial, also testified during the evidentiary hearing. According to Eisenberg, his theory in "phase one,"[21] was that the defendant had "come across Jo[h]n Hardeman and shot him accidently." Eisenberg further elaborated that the defendant

---

[21]Eisenberg referred to "phase one" and "phase two" theories. It appears that he was referring to the guilt and sentencing phases of the trial.

was startled and I guess, I think, Mr. Hardeman had accidentally shot in Mr. LeCroy's direction and, therefore, startled Mr. LeCroy, who instinctively shot back and it was either an accident or self-defense type action, and that as to Gail Hardeman, that he had been, he was upset and he had been confronted by her yelling and screaming and the gun went off, not to intentionally kill her, and either by accident or a lesser degree of homicide.

Although Eisenburg stated that he had some reason to believe either Jon LeCroy or the defendant's father "did it," he admitted that the defendant consistently told him "that he was the one who pulled the trigger."

After conducting the evidentiary hearing, the district court denied the defendant's § 2254 petition. As for the guilt-phase claims that were not dismissed as procedurally barred, the district court concluded that: (1) the defendant failed to establish that either his trial or appellate counsels' performances were deficient; (2) the defendant failed to establish any prejudice from the alleged Brady violations; and (3) the defendant failed to establish that the government knowingly used materially false evidence in violation of Giglio.

On September 27, 2004, the district court granted a certificate of appealability as to all of the defendant's claims, including those claims the district court determined were procedurally barred. The defendant timely appealed.

**VI. Standard of Review**

49

Because LeCroy filed his federal habeas petition after April 24, 1996, this case is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which "establishes a highly deferential standard for reviewing state court judgments." Parker v. Sec'y for Dep't of Corr., 331 F.3d 764, 768 (11th Cir. 2003); see Haliburton v. Sec'y for Dep't of Corr., 342 F.3d 1233, 1237-38 (11th Cir. 2003) ("both the district court's review and our review is greatly circumscribed and is highly deferential to the state courts") (quotation marks and citation omitted); Crawford v. Head, 311 F.3d 1288, 1295 (11th Cir. 2002) (same).

Under AEDPA, a person in custody pursuant to the judgment of a state court shall not be granted habeas relief unless the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

Moreover, § 2254(e)(1) provides that "a determination of a factual issue made by a State court shall be presumed to be correct" unless the petitioner carries his burden to rebut the presumption of correctness "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see also Robinson v. Moore, 300 F.3d 1320, 1342 (11th Cir. 2002).

50

In this case, the district court conducted an evidentiary hearing as to some of the defendant's claims. Section 2254(e)(2) severely limits the circumstances in which a district court may properly conduct an evidentiary hearing. 28 U.S.C. § 2254(e)(2).[22] On appeal, the state has not challenged the district court's decision to hold an evidentiary hearing as to some of defendant's claims.[23] Rather, the state contends that, after conducting an evidentiary hearing, the district court properly denied the defendant's § 2254 petition.

---

[22]Section 2254(e)(2) provides:
If the applicant has failed to develop the factual basis of a claim in State court proceedings, the court shall not hold an evidentiary hearing on the claim unless the applicant shows that –
    (A) the claim relies on –
        (i) a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
        (ii) a factual predicate that could not have been previously discovered through the exercise of due diligence; and
    (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.
28 U.S.C. § 2254(e)(2).

[23]As discussed earlier, the defendant timely requested an evidentiary hearing in the State 3.850 Court, but that request was denied. The district court found that the defendant was diligent in his efforts to develop the factual basis of his exhausted claims in state court, but had been summarily denied an evidentiary hearing. Further, because on appeal the state has not challenged the district court's grant of the federal evidentiary hearing, we need not, and do not, decide whether the district court erred in granting a federal evidentiary hearing in this case. See McNair v. Campbell, 416 F.3d 1291, 2005 WL 1634046, at *3-4 (11th Cir. July 13, 2005).

Furthermore, when reviewing the district court's denial of a § 2254 habeas petition, we review questions of law and mixed questions of law and fact <u>de novo</u>, and findings of fact for clear error. <u>Nyland v. Moore</u>, 216 F.3d 1264, 1266 (11th Cir. 2000); <u>Wright v. Hopper</u>, 169 F.3d 695, 701 (11th Cir. 1999). Finally, "[t]he district court's determination of whether the state court decision was reasonable . . . is subject to <u>de novo</u> review." <u>Hall v. Head</u>, 310 F.3d 683, 690 (11th Cir. 2002).

## VII. Discussion

### A. Conviction Issues – Procedural Bar

In his § 2254 petition, the defendant raised the following issues concerning his convictions which both the state courts and the federal district court determined were procedurally barred: (1) the trial court's lock-up statement violated the Constitution; (2) the districting procedure in Palm Beach County was unconstitutional; (3) the state's introduction of shocking and gruesome photographs violated the Constitution; (4) the state engaged in several instances of prosecutorial misconduct.

With regard to the defendant's claim that the trial court's lock-up statement violated the Constitution, the State 3.850 Court determined that the claim was procedurally barred because it either was or could have been raised on direct appeal. "The difficulty with the procedural default argument is found in the 'was

52

raised' or 'could have been raised' dichotomy." Smith v. Dugger, 840 F.2d 787, 791 (11ᵗʰ Cir. 1988) (discussing the state court's refusal to address the merits of a claim made in a 3.850 proceeding).

As this Court has concluded, if, in fact, the claim was raised on direct appeal in state court, it was necessarily ruled upon and might very well be "foreclosed from state collateral attack, [but] it would be available in the federal case as an exhausted claim." Id. If, however, the claim "could have been raised [on direct appeal], but was not, it would be barred from any state collateral review, and likewise barred from federal review." Id. (citing Murray v. Carrier, 477 U.S. 478, 106 S. Ct. 2369 (1986)). Reviewing the state court record, we conclude that the defendant did not raise the lock-up statement as a claim on direct appeal to the Florida Supreme Court. Furthermore, the defendant did not appeal the State 3.850 Court's determination that this claim was procedurally barred to the Florida Supreme Court.[24]

---

[24]The defendant did raise a related claim in his state habeas petition before the Florida Supreme Court; namely that appellate counsel was ineffective for failing to raise the state trial court's comments as an issue on appeal. The Florida Supreme Court rejected that issue. LeCroy, 727 So.2d at 241-42.

"In order to be exhausted, a federal claim must be fairly presented to the state courts." McNair v. Campbell, 416 F.3d 1291, 2005 WL 1634046, at *6 (11ᵗʰ Cir. July 13, 2005). "It is not sufficient merely that the federal habeas petitioner has been through the state courts . . . nor is it sufficient that all the facts necessary to support the claim were before the state courts or that a somewhat similar state-law claim was made." Kelly v. Sec'y for Dept. of Corr., 377 F.3d 1317, 1343-44 (11ᵗʰ Cir. 2004) (citations omitted). Rather, federal courts "have required a state

Accordingly, we conclude that the State 3.850 Court's refusal to consider

the defendant's assertion that the trial court's lock-up statement violated the

Constitution as procedurally barred rested on an independent and adequate state

ground that precludes federal habeas consideration of this issue.[25]  We also

conclude that the defendant failed to properly exhaust this issue when he failed to

raise it, or an issue sufficiently similar, to the Florida Supreme Court on direct

appeal or in his appeal of the State 3.850 Court's decision.  Consequently, this

claim about the trial court's lock-up statement is procedurally barred, and we do

not consider it.  See, e.g., Coleman v. Thompson, 501 U.S. 722, 735 n.1, 111 S. Ct.

2546, 2557 n.1 (1991) ("[I]f the petitioner failed to exhaust state remedies and the

court to which the petitioner would be required to present his claims in order to

---

prisoner to present the state courts with the same claim he urges upon the federal courts." Picard v. Connor, 404 U.S. 270, 276, 92 S. Ct. 509, 512 (1971).  "While we do not require a verbatim restatement of the claims brought in state court, we do require that a petitioner presented his claims to the state court such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation." McNair, 416 F.3d at –, 2005 WL 1634046, at *7 (internal quotation marks and citations omitted).  We conclude the substantive claim that the trial court erred by making the lock-up statement is separate and distinct from an ineffective-assistance-of-counsel claim based on the failure to object to, or appeal, the trial court's lock-up statement.  Thus, this claim was not fairly presented to the state courts.

[25]This Court has already concluded that the procedural requirements of Florida's Rule 3.850 constitute independent and adequate state grounds under the applicable law.  Whiddon v. Dugger, 894 F.2d 1266, 1267-68 (11th Cir. 1990).

54

meet the exhaustion requirement would now find the claims procedurally barred . . . there is a procedural default for purpose of federal habeas . . . .").[26]

With regard to the defendant's second claim, that the districting procedure in Palm Beach County was unconstitutional, the defendant did not raise this issue on direct appeal or in his state 3.850 motion. Consequently, the district court properly determined that this claim was unexhausted and procedurally barred, and we do not consider it.[27] See id.

As for the defendant's claim that the state's introduction of shocking and gruesome photographs violated the Constitution, the State 3.850 Court determined that the claim was procedurally barred because it could have been raised on direct appeal. Likewise, the Florida Supreme Court also determined that the claim was

---

[26]AEDPA has slightly altered how federal courts may deal with procedurally defaulted claims. According to § 2254(b)(1)(A), a federal court is precluded from granting habeas relief unless "the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A) (emphasis added). However, "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State." Id. at § 2254(b)(2) (emphasis added). While we have the option to deny the claim on the merits, we also may continue to rest our conclusions on the procedural bar.

[27]We do note that in his state habeas petition, the defendant raised an issue of ineffective assistance of counsel based on appellate counsel's failure to raise this districting issue in his 1998 direct appeal. However, the Florida Supreme Court concluded that this ineffective-assistance-of-counsel issue "has already been decided adversely to the defendant." LeCroy, 727 So.2d at 241 (citing Nelms v. State, 596 So.2d 441 (Fla. 1992)). As in Nelms, the defendant's 1986 trial and 1988 direct appeal were concluded before the 1989 ruling regarding the Palm Beach districting plan in Spencer v. State, 545 So.2d 1352 (Fla. 1989), and, thus, appellate counsel was not ineffective for failing to anticipate the change in the law. Nelms, 596 So.2d at 442.

55

procedurally barred. Consequently, we conclude that the state court's decision rested on independent and adequate state grounds, and that federal habeas relief is unavailable to the defendant on this issue.

Finally, the defendant asserts that the state engaged in several instances of prosecutorial misconduct. Both the State 3.850 Court and Florida Supreme Court (in the appeal from the denial of 3.850 relief) determined that these claims were procedurally barred because they could have been raised on direct appeal.[28] As with the defendant's claim regarding the shocking and gruesome photographs, the state court's determination rests on independent and adequate state grounds and habeas relief is, therefore, unavailable.

## B. Conviction Issues – Evidentiary Hearing

As noted earlier, the district court did conduct an evidentiary hearing on the following three guilt-phase issues: (1) ineffective assistance of appellate counsel on direct appeal; (2) ineffective assistance of trial counsel; and (3) the state's violations of the constitutional requirements of <u>Brady</u> and <u>Giglio</u>. The district

---

[28]The State 3.850 Court considered and rejected two of the defendant's claims of prosecutorial misconduct on the merits: (1) allegedly transferring government-witness Slora in exchange for favorable testimony; and (2) giving the witnesses scripts of their expected testimony. To the extent these issues are not procedurally barred, we conclude that the state court's resolution of these issues is not contrary to, or an unreasonable application of, federal law.

56

court considered the merits of these three claims and concluded that none of these claims warranted habeas relief.

In this case, the state courts denied the defendant's ineffective-assistance-of-counsel claims based solely on the prejudice prong of Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).[29]  However, after the evidentiary hearing, the district court denied the defendant's ineffective-assistance-of-counsel claims based solely on the performance prong of Strickland. The district court also concluded that the defendant failed to establish prejudice from any Brady violations, and failed to show any Giglio violations.  These different conclusions ordinarily warrant different deference.

As for the district court's conclusions regarding the performance prong of Strickland, we engage in de novo review and do not defer to the state court because it did not rule on the performance prong (thus, there is nothing to defer to as to that sub-issue).  However, as to the prejudice prong and the state court's ultimate denial of the defendant's ineffective-assistance-of-counsel claims, we may grant habeas relief only if the state court's resolution of these issues was (1) "contrary to, or involved an unreasonable application of, clearly established

---

[29]Under Strickland, the defendant must establish both that his counsel's performance was deficient and that he was prejudiced by his counsel's deficient performance.  Strickland, 466 U.S. at 687, 104 S. Ct. at 2064.

Federal law as determined by the Supreme Court of the United States; or (2) . . . was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The fact that the district court held an evidentiary hearing may add a potential wrinkle to AEDPA's deference. Some courts have concluded that the fact that a district court holds an evidentiary hearing in accordance with AEDPA does not alter the federal standard of review; that is, courts are still required to apply the deference mandated in § 2254(d). See Matheney v. Anderson, 377 F.3d 740, 747 (7th Cir. 2004) ("[O]ur case law is clear in holding that § 2254(d) is applicable even though the district court held an evidentiary hearing. The evidence obtained in such a hearing is quite likely to bear on the reasonableness of the state courts' adjudication but we do not see why it should alter the standard of federal review." (internal quotation marks, citations, and ellipsis omitted)); Valdez v. Cockrell, 274 F.3d 941, 946-47, 951-52 (5th Cir. 2001) ("Where a district court elects, in instances not barred by § 2254(e)(2), to hold an evidentiary hearing, the hearing may assist the district court in ascertaining whether the state court reached an unreasonable determination under either § 2254(d)(1) or (d)(2). An evidentiary hearing is not an exercise in futility just because §§ 2254(d) and (e)(1) require deference."). On the other hand, some courts have concluded, at least in certain

instances, that AEDPA's requirement of deference to state court determinations is not applicable when the federal evidentiary hearing reveals new evidence that was not considered by the state court.  See Monroe v. Angelone, 323 F.3d 286, 297 (4th Cir. 2003) ("AEDPA's deference requirement does not apply when a claim made on federal habeas review is premised on Brady material that has surfaced for the first time during federal proceedings."); see also Holland v. Jackson, 124 S. Ct. 2736, 2738 (2004); Miller v. Champion, 161 F.3d 1249, 1254 (10th Cir. 1998).[30]

We need not decide what effect, if any, the federal evidentiary hearing in this case has on our standard of review because whether we engage in de novo review or apply the deference mandated in § 2254(d), we conclude that the district

---

[30]The argument as to why § 2254(d) might not apply in certain instances in which a federal evidentiary hearing is premised in sound practicality.  If the federal evidentiary hearing uncovers new, relevant evidence that impacts upon a petitioner's claim(s) and was not before the state court, it is problematic to ascertain how a federal court would defer to the state court's determination.  That is, the new, relevant evidence was never before the state court so it never considered the impact of the evidence when denying relief, and there is arguably nothing to defer to.

In contrast, the argument that a federal evidentiary hearing does not alter the federal standard of review is as follows.  AEDPA places a highly deferential standard of review in habeas cases and provides that habeas relief "shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings" unless certain conditions are met.  28 U.S.C. § 2254(d).  The words "shall" and "any" are powerful words and render AEDPA applicable to all claims raised in a habeas petition regardless of whether a federal evidentiary hearing is held.  After all, AEDPA itself dictates under what circumstances a federal evidentiary hearing can be held.  See 28 U.S.C. § 2254(e).  A petitioner's habeas claim, even if subject to a proper federal evidentiary hearing, is still "any" claim for the purposes of § 2254(d)'s highly deferential standard of review, and the new evidence in the federal proceeding is considered in determining whether the state court reached an unreasonable determination.  Again, we do not decide, or imply in any way, which approach is correct.

59

court properly denied habeas relief as to the defendant's guilt-phase claims. In addition to determining that none of the defendant's guilt-phase claims warrants habeas relief, we also conclude that only two of his claims warrant additional discussion.

## C.     Ineffective Assistance of Trial Counsel

The defendant claims that his trial counsel was ineffective because he failed to introduce evidence that would point to Jon LeCroy's guilt. We first discuss Strickland's performance prong.

### 1.     Performance Prong

As noted by the district court, "it appears that [the defendant's] trial defense counsel conducted a thorough investigation and analysis of the case and upon his professional review, he made reasoned, strategic decisions with respect to the presentation of evidentiary and legal issues to the trial court." Further, the district court concluded that the defendant "is really objecting to . . . the trial strategy employed by trial defense counsel" and "[t]his Court does not elect to second guess the trial strategy decisions of competent counsel." Because the state courts rested their denial of the defendant's ineffective-assistance-of-counsel claims on the prejudice prong of Strickland and we owe no deference to the district court on

this issue, we first determine <u>de novo</u> whether trial counsel's performance was constitutionally ineffective.

During the evidentiary hearing on the defendant's § 2254 petition, trial counsel, Eisenberg, described his theory of defense as being an accident or lesser degree of homicide.[31] Eisenberg described the defendant at the time of the murders as being

> startled and I guess, I think, Mr. Hardeman had accidentally shot in Mr. LeCroy's direction and, therefore, startled Mr. LeCroy, who instinctively shot back and it was either an accident or self-defense type action, and that as to Gail Hardeman, that he had been, he was upset and he had been confronted by her yelling and screaming and the gun went off, not to intentionally kill her, and either by accident or a lesser degree of homicide.

The defendant was charged with the felony murders of John and Gail Hardeman. If convicted of either of these crimes, the defendant faced the possibility of the death penalty. However, if the jury determined that the defendant committed only third-degree murder (no premeditation or intent to rob before the killings), the defendant would not be eligible for the death penalty.

Defense counsel was by no means inactive or passive during the defendant's trial. Rather, counsel filed dozens of motions, and was initially successful in

---

[31]The Assistant State's Attorney, Barlow, who prosecuted the case against the defendant, testified that defense counsel used a different defense theory. Specifically, Barlow stated that, "the underlying defense was Cleo didn't do it. Maybe Jon did it . . . ."

getting the defendant's confessions and other evidence suppressed by the state trial court.[32]  In addition to filing several pre-trial motions, defense counsel deposed government witnesses and, at trial, extensively cross-examined all but one of the government witnesses.  Defense counsel throughly tested the government's case.  While defense counsel did not call witnesses as part of the defendant's case, this decision provided defense counsel with the final closing argument.  See Fla. R. Crim. P. 3.250.

The defendant asserts that rather than simply putting the government to its burden of proving the felony murders, defense counsel should have elicited evidence of Jon LeCroy's guilt and concurrent prosecution for the same offenses.[33]  However, this ignores the fact that the trial evidence already made the jury aware of: (1) Jon LeCroy's involvement in the search for the Hardemans; and (2) the fact that it was Jon LeCroy, not the defendant, who ultimately led the authorities to the Hardemans' bodies.

---

[32]The fact that the Florida Supreme Court later reversed the state trial court and determined that the defendant's confessions and other evidence was admissible does not render trial counsel's performance deficient.

[33]The defendant claims that counsel was ineffective in a number of ways, including failing to do the following: (1) discover and use Jon LeCroy's polygraph results; (2) present evidence that Jon LeCroy gave police a rifle different from the one he had used the day of the murders; (3) present a letter Jon LeCroy wrote his attorney asking him if he would get more time than his brother if convicted; (4) present evidence that the defendant's parents favored Jon LeCroy and changed their initial statement to police; and (5) present evidence of improper police tactics used to coerce statements from Jon LeCroy and his parents.

As for the additional evidence pointing to Jon LeCroy's involvement, the State 3.850 Court concluded that there was no basis for admission of such evidence. The Florida Supreme Court summarily affirmed. See LeCroy, 727 So.2d at 241. For example, the defendant contends that trial counsel was ineffective for failing to obtain and introduce evidence of Jon LeCroy's polygraph results.[34]

According to Florida law, polygraph results are inadmissable unless both parties consent. Sochor v. State, 883 So.2d 766, 787 (Fla. 2004); Davis v. State, 461 So.2d 67, 70 (Fla. 1984). If the state had consented, Jon LeCroy's polygraph results could have been admitted. However, it is extremely unlikely the state would have consented to their admission. Consequently, even assuming defense counsel had access to Jon LeCroy's polygraph results, his performance was not deficient.

---

[34]On January 13, 1981, Jon LeCroy took a polygraph examination at the Palm Beach County Sheriff's Office. According to the defendant's state 3.850 motion, Jon LeCroy showed deception as to the following questions: (1) Were you there when your bother shot those people?; (2) Did you shoot the man or the woman?; and (3) "Did you see those bodies the day they were shot?" On June 10, 1981, Jon LeCroy took a second polygraph with the State Public Defender's Office in West Palm Beach. According to the results, Jon LeCroy was being truthful when he stated that he did not shoot John Hardeman, but was being deceptive when he said he did not shoot Gail Hardeman.

The defendant also points to a letter from Jon LeCroy to his attorney asking if it was true that he would get more time than the defendant if convicted.[35] Given the clear inadmissibility of such a letter, defense counsel's performance at trial was not deficient for failing to seek its admission.[36]

The defendant further claims that defense counsel should have elicited testimony from William Ellett that while Ellett and the defendant were on the phone together, Ellett heard Jon LeCroy in the background demanding that the defendant get his (Jon LeCroy's) money for the rifle. The fact is that defense counsel attempted to introduce such evidence at trial, but the state trial court excluded such evidence on hearsay grounds. Therefore, defense counsel already attempted to introduce the very evidence that the defendant now claims that defense counsel should have attempted to introduce.

In this case, the defendant had not one, but two taped confessions to the police and had also confessed to his ex-girlfriend. Against this, and other, overwhelming evidence, defense counsel attempted a two-prong attack. He attempted to place as much blame on the hands of Jon LeCroy with admissible

---

[35]The State 3.850 Court mistakenly refers to the letter as a letter from Jon LeCroy to his father.

[36]Even if the attorney-client privilege did not apply, the defendant has not asserted any potential basis for the admission of such a letter.

evidence as possible while still maintaining that the killings were accidental, and not premeditated or the result of a plan to rob the Hardemans. Given the overwhelming evidence in this case, we cannot fault defense counsel's trial strategy.

## 2. Prejudice Prong

Even assuming defense counsel's performance was deficient, the state courts determined that the defendant failed to establish any prejudice. With respect to this claim, the State 3.850 Court concluded that the defendant had not shown a reasonable probability that counsel's performance would have affected the outcome of the trial. Specifically, the State 3.850 Court concluded that

> singularly or cumulatively, the allegations of deficient conduct that are sufficiently pled, even if taken as true, would not have, within a reasonable probability, affected the outcome of this case. As noted previously, the quality and quantity of evidence presented by the State simply would not have been undermined even if defense counsel had presented the evidence that Defendant claims he should have presented. Therefore, this claim is denied.

With respect to the defendant's claim that his trial counsel was ineffective during the guilt phase, the Florida Supreme Court again concluded that the State 3.850 Court "properly applied the law. We find no error." LeCroy, 727 So.2d at 241.

In this case, the defendant had two taped confessions in which he admitted killing the Hardemans and stealing their firearms. The defendant's ex-girlfriend

65

also testified that the defendant admitted to killing the Hardemans. Furthermore, Ellett testified that the defendant sold him John Hardeman's rifle, and several witnesses testified that the defendant made statements directly linking him to the killings. Additionally, Martin placed the defendant with the Hardemans shortly before hearing a series of gunshots. Physical and circumstantial evidence corroborated the defendant's confessions and further established the defendant's guilt. Against this mountain of evidence, any attempt to place all or part of the responsibility on Jon LeCroy would have been ineffectual.

The jury was already aware that Jon LeCroy was the individual who discovered the bodies, and that Jon LeCroy was also hunting in the area. As outlined by Barlow during the federal evidentiary hearing, the state's theory of the case was that both the defendant and Jon LeCroy were involved in the Hardemans' deaths.

The jury returned a guilty verdict against the defendant in under three hours. A few pieces of additional evidence further linking Jon LeCroy to the murders would not have affected the outcome of the trial. Consequently, the defendant has not established the requisite prejudice from defense counsel's performance.

**D.** **Brady**

Lastly, we consider the defendant's claims that the state's alleged Brady violations warrant a new trial. Regarding these claims, the defendant points to the contentious and deteriorating relationship between his defense counsel and the state during the guilt phase and contends that the state withheld evidentiary materials. Specifically, the defendant contends that the state failed to disclose witness scripts, an interoffice memorandum regarding a jailhouse witness, a Florida Game and Fresh Water Fish Commission report, his medical files, and exculpatory evidence related to witness David Swanson. As detailed below, none of the defendant's Brady claims warrants habeas relief.

As the State 3.850 Court correctly concluded regarding the non-disclosed evidentiary materials in issue,

> [t]he burden is on the Defendant to make at least a prima facie showing that individually or cumulatively this "evidence" would have, within a reasonable probability, changed the outcome of his trial. His speculation and conjecture about what the letters and notes and opinions and cryptic references *may* suggest is not sufficient to warrant an evidentiary hearing, much less relief. The evidence in this case was overwhelming. The Defendant not only confessed to killing the Hardemans to the police, but he confessed to Carol Hundley and Roger Slora. A plethora of physical and circumstantial evidence corroborated those confessions and further established the Defendant's guilt. Based on the wealth of evidence against him, there is no reasonable probability that his conviction and sentence of death would have been different had the State disclosed or defense counsel discovered the evidence alleged by Defendant in this claim.

Further, the Florida State Supreme Court concluded that the State 3.850 Court correctly applied the law and found no error. LeCroy,727 So.2d at 238-39.

The district court also concluded that the defendant had failed to demonstrate any Brady violation. Specifically, the district court determined that the defendant "failed to demonstrate any prejudice because he failed to show that the errors at trial actually and substantially disadvantaged his defense so that he was denied fundamental fairness and that there is a reasonable probability that the jury would have returned a different verdict had the evidence . . . been disclosed."

In this case, the defendant complains that the following constitutes Brady violations. First, the prosecutor in this case typed out all questions and answers (in script form) for its witnesses. The government did not turn over these scripts. During the federal evidentiary hearing, Barlow stated that he gave these typed "scripts" to the witnesses and then "go[es] over with them those questions to confirm their answers are, in fact, based on what they have said in depositions, police statements, accurate. . . . I confirm with them whether that is still accurate, if there is any change in that, and that's how I actually prepare for that witness to testify." According to the district court, the defendant "failed to demonstrate that the 'scripts' were anything more than mere common witness preparation by the State."

Even assuming arguendo that such evidence constitutes <u>Brady</u> material, there is no allegation that any of the testimony of the government's witnesses, with the exception of Slora (discussed below), was false. Furthermore, even if the scripts could have been used to impeach certain witnesses, the evidence of the defendant's guilt, as the state courts have pointed out, was overwhelming in this case. We readily determine that nothing in the state-court record or in the federal evidentiary hearing demonstrates that the defendant suffered any prejudice from the non-disclosed material. Consequently, the defendant is not entitled to habeas relief on this ground.

Second, the state did not turn over a State Attorney's inter-office memorandum that indicated that Slora, the Florida state prisoner who testified at the defendant's trial, read the discovery police reports before testifying.[37] However, Slora was extensively cross-examined at trial and his credibility was challenged in several ways. As the state court determined, the defendant failed to establish any prejudice from the alleged <u>Brady</u> violation. One more piece of evidence challenging Slora's already-suspect credibility would not have changed

---

[37]During the federal evidentiary hearing, the State Attorney who wrote the memorandum explained that she had no personal knowledge concerning whether Slora read the police reports before testifying, only that it was her opinion that he might have. We assume, but do not decide, that Slora read the police reports before testifying.

the outcome of the defendant's trial.  Consequently, habeas relief is unavailable to the defendant on this claim.

Third, the state did not turn over a Florida Game and Fresh Water Fish Commission memo to the Palm Beach County Sheriff's Office concerning a statement Tom LeCroy (the defendant's father) made that he could find the body of John Hardeman in 15 minutes.[38]  This is undoubtedly Brady material, and although the state should have produced the document, the state court correctly determined that the defendant failed to establish prejudice.  Given the wealth of evidence against the defendant and the lack of evidence regarding Tom LeCroy's guilt, it would have been futile to pursue a defense centered around Tom LeCroy's guilt.  Thus, the defendant is also not entitled to habeas relief on this claim.

Fourth, the defendant claims that he was unaware that the state had medical and school files relating to him.  The medical files contained information that stated that when the defendant became excited or agitated, he had fainting spells and alleged memory loss.  The medical and school files indicated that the defendant had a low IQ and was learning disabled.[39]

---

[38]The district court determined that this was Brady material, but that it would not have changed the outcome of the case.

[39]The district court determined that this Brady claim had to fail because the defendant could not show that the medical and school records could not have been discovered by trial counsel using due diligence.

70

To establish that he suffered a <u>Brady</u> violation, the defendant must prove that: (1) the government possessed evidence favorable to him; (2) the defendant did not possess the evidence and could not have obtained it with reasonable diligence; (3) the government suppressed the favorable evidence; and (4) the evidence was material. <u>United States v. Meros</u>, 866 F.2d 1304, 1308 (11th Cir. 1989). In this case, defense counsel obviously could have obtained the defendant's <u>own</u> medical and school records by exercising reasonable diligence. Consequently, there is no <u>Brady</u> violation.

Finally, the defendant claims that the state withheld information regarding Swanson. Swanson was another Florida inmate that the defendant said gave information to the authorities because he (Swanson) was threatened by the authorities. However, Swanson never testified at the defendant's trial. Therefore, any information that would have impeached Swanson's credibility is immaterial. Thus, we conclude that the defendant did not suffer any prejudice from the non-disclosure of these materials and is not entitled to habeas relief on his <u>Brady</u> claims.

## VIII. Conclusion

Because the defendant's death sentence has been vacated, we dismiss as moot his § 2254 petition to the extent it challenges his death sentence. However,

71

in all other respects, and for the reasons stated above, we affirm the district court's denial of the defendant's § 2254 petition.

**DISMISSED IN PART and AFFIRMED IN PART**.